*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALONZO FLORES CASTILLO,

Defendant-Appellant.

UNPUBLISHED
August 13, 2020

No. 338754
Saginaw Circuit Court
LC No. 16-042601-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT CONLEY, III,

Defendant-Appellant.

No. 339093
Saginaw Circuit Court
LC No. 16-042602-FC

---

Before: MURRAY, C.J., and CAVANAGH and SWARTZLE, JJ.

PER CURIAM.

In Docket No. 338754, defendant Alonzo Flores Castillo appeals as of right his convictions by a jury of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84; conspiracy to commit AWIGBH, MCL 740.84 and MCL 750.157a; two counts of carrying a dangerous weapon with unlawful intent (CDWUI), MCL 750.226; and three counts of possessing a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b. The trial court, applying a fourth-offense habitual offender enhancement under MCL 769.12, sentenced Castillo to three concurrent terms of five years' imprisonment for felony-firearm, second offense, two terms of 134 to 300 months' imprisonment for AWIGBH and conspiracy, and two terms of 72 to 180 months' imprisonment for CDWUI.

In Docket No. 339093, defendant Robert Conley, III, who was tried jointly with Castillo, appeals as of right his convictions by the same jury of AWIGBH; conspiracy to commit AWIGBH; CDWUI; felon in possession of a firearm, MCL 750.224f; and four counts of felony-firearm. The trial court, once again applying a fourth-offense habitual offender enhancement, sentenced Conley to four concurrent terms of two years' imprisonment for felony-firearm, two terms of 96 to 240 months' imprisonment for AWIGBH and conspiracy, and two terms of 58 to 180 months' imprisonment for CDWUI and felon-in-possession. We affirm in both appeals.

The convictions arose from an attack on Salvador Gomez—who had been dating Castillo's mother—on the porch of a Saginaw home where Gomez had been staying. The attack occurred during the early-morning hours of June 3, 2016. The prosecutor presented evidence that Castillo and Conley beat Gomez about the head with blunt objects, and that Conley held a gun obtained from Castillo to Gomez's head and threatened his life. Gomez sustained extensive lacerations to the head, experienced very heavy bleeding, and required 85 staples and five stitches to repair the wounds. Both defendants have been prolific in filing documents and affidavits with this Court, and this Court has entered numerous orders pertaining to motions to remand, motions to add issues on appeal, and other miscellaneous matters. This Court remanded both cases for evidentiary hearings on various issues, and the trial court, in a lengthy and well-reasoned opinion, concluded at the end of three days of hearings that neither defendant was entitled to a new trial.

## I. EVIDENCE OF DRUG DEBTS

Castillo and Conley first argue that the trial court erred by prohibiting the defense from exploring at trial whether Gomez owed money to drug dealers. They argue that they were unfairly deprived of the defense that drug dealers might have been Gomez's attackers. This Court reviews for an abuse of discretion a trial court's decision regarding the admission of evidence. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017).

The biggest hurdle for defendants' arguments is that Castillo's attorney, James Piazza, did, in fact, ask the question about whether Gomez owed people money for drugs, and Gomez said no.[1] This testimony from Gomez was never retracted. The simple fact is that, contrary to defendants' implication, the issue *was* allowed into the trial—and Gomez testified in the prosecutor's favor. And defendants point to no instance during which they presented the trial court with evidence that Gomez had, in fact, owed people money for drugs or during which they tried to introduce a witness who would testify regarding this alleged fact.

Castillo's mother, Melissa Flores, provided an affidavit on appeal stating that before the incident she witnessed persons who claimed Gomez owed them money for drugs threatening and harassing Gomez. She stated that she was willing to testify about this at trial, but was never called to testify. However, this "drug dealers" issue was not a part of the remand proceedings, so this

---

[1] At trial, Piazza asked Gomez if he owed people money for drugs. Gomez answered, "I don't— don't know where that came from, no." Piazza asked again if Gomez owed money, and Gomez said, "No, you were stating that I owed." After a bench conference the court stated that there was no evidence that Gomez owed money to drug dealers, and that the issue was not to be pursued.

-2-

affidavit is not part of the lower court record.  An appellant may not expand the record on appeal. *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002).

Castillo argues that if this Court does not reverse his convictions on the basis of this issue, we should grant an evidentiary hearing regarding it.  But despite filing multiple motions to remand and to add issues in this Court, Castillo did not, after the filing of his initial appellate brief on February 16, 2018, raise this "drug dealers" issue again.  Nor did Castillo try to address the issue during the subsequent evidentiary hearing.  Moreover, a key part of Flores's statement involves people allegedly claiming—i.e., telling her—that Gomez owed them money for drugs.  In other words, it involves hearsay.  " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).  Hearsay is not admissible except as provided by the court rules.  MRE 802.  MRE 804(b)(3) states that the following is not excluded by the hearsay rule if the declarant is unavailable as a witness:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

There is no indication (1) that the supposed drug dealers were unavailable as witnesses, or (2) that Flores's proposed testimony about their alleged statements that Gomez owed them money was supported by "corroborating circumstances [that] clearly indicate the trustworthiness of the statement" MRE 804(b)(3).[2]  Under all the circumstances, we decline to remand for further factual development.

## II.  OFFENSE VARIABLE 3

Castillo argues that the court erred in scoring offense variable (OV) 3 of the sentencing variables.  A sentencing court's factual determinations under the sentencing guidelines are reviewed for clear error and must be supported by a preponderance of the evidence.  *People v Rodriguez*, 327 Mich App 573, 576; 935 NW2d 51 (2019).  This Court reviews de novo, as a matter of statutory interpretation, whether the facts as found by the lower court are adequate to satisfy the scoring conditions prescribed by statute.  *Id*.  A trial court's findings are clearly erroneous if, "after [this Court has] reviewed the entire record, [this Court is] definitely and firmly

---

[2] Indeed, Flores, in her affidavit, provided general claims and no specific details about these alleged drug dealers or their alleged threats.  We also note that while Flores claimed in the affidavit that she was available to testify about the matter, she did not indicate in the affidavit that she *told* either defense attorney about her proposed testimony.

convinced" that the trial court made a mistake. *People v Armstrong*, 305 Mich App 230, 237; 851 NW22d 856 (2014).

MCL 777.33[3] ("physical injury to a victim") provides for a score of 25 points for OV 3 if "[l]ife threatening or permanent incapacitating injury occurred to a victim[.]" MCL 777.33(1)(c). It provides for a score of 10 points if "[b]odily injury requiring medical treatment occurred to a victim[.]" MCL 777.33(1)(d). Castillo received 25 points for OV 3.

At sentencing, Piazza argued that OV 3 should be scored at 10 points, stating that although blows to one's head can be life-threatening, they were not, in fact, life-threatening in this case. The court replied:

> He had to have staples in his head, I forget how many it was. He was a mess. So the doctor said it's not life-threatening because he saved his life, not because he didn't try to kill him, so [no].

A doctor testified at trial that Gomez's injuries "ended up not being life-threatening," and that he had no concussion and no skull fracture. However, Gomez received "85 staples over a total of 20 centimeters of laceration," as well as five stitches. These were head lacerations, and the doctor stated that head injuries "bleed[] profusely." The doctor also said that when Gomez arrived at the hospital, his wounds were treated as life-threatening.

Gomez's attorney admitted that blood had been "all over" Gomez's chest, even though he was struck only in the head. The police officer who responded to the scene of the assault said that Gomez was "bleeding quite heavily from the top of his head," and that there was "heavy, heavy blood" at the scene, including blood splatter on the ceiling of the porch.

Given the amount of staples Gomez needed and the length of his lacerations; given the testimony about how much Gomez had bled and was continuing to bleed; and given the doctor's testimony that head injuries, in general, bleed profusely, the trial court did not err by finding that, under a preponderance of the evidence, Gomez sustained a life-threatening injury. Massive blood loss is obviously life-threatening, but fortunately Gomez received medical treatment to stop the blood loss. No error is apparent with regard to the scoring of OV 3.

Castillo's additional argument about sentence disproportionality is entirely predicated on his argument that OV 3 was misscored, thereby rendering the sentence imposed a departure from the guidelines. Because OV 3 was not misscored, we need not reach the disproportionality argument.

## III. HABITUAL OFFENDER NOTICE

Castillo argues that he should not have been sentenced as an habitual offender because the prosecutor violated statutory requirements regarding notice. We review this unpreserved issue for

---

[3] Although this statute was amended by 2017 PA 152, and the amendment took effect after Castillo's sentencing, the amendment did not impact the language at issue.

plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

MCL 769.13(1) states that a prosecutor may seek a habitual offender enhancement "by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense." MCL 769.13(2) states, in part, that "[t]he notice shall be filed with the court and served upon the defendant or his or her attorney within the time provided in subsection (1)."

Castillo argues that he was arraigned on June 13, 2016—but this was clearly an arraignment on the initial charges and not an arraignment *on the information*. See, e.g., *People v Nix*, 301 Mich App 195, 207-208; 836 NW2d 224 (2013) (discussing the initial arraignment and the arraignment on the information); see also MCR 6.113. The preliminary examination—which precedes issuance of a felony information, see, e.g., *Nix*, 301 Mich App at 207—did not even take place until July 6, 2016; the felony information was issued on July 27, 2016;[4] and in this very document the prosecutor set forth the habitual offender enhancement. The register of actions reflects proof of service of the information on July 29, 2016. Significantly, Castillo is *not* arguing that his apparent waiver of arraignment on the information was somehow faulty or that the prosecutor did not have the authority to pursue the charges against him at trial.[5] Clearly the habitual offender notice, filed *with the information itself*, was filed "within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived, within 21 days after the filing of the information charging the underlying offense." MCL 769.13(1). And Castillo was properly served. Castillo's argument provides no basis for reversal.

IV. MEDICAL EVIDENCE REGARDING LEG INJURY

Castillo argues that Piazza rendered ineffective assistance of counsel by failing to introduce medical records and medical testimony about a leg injury he suffered approximately two months before the assault on Gomez. He contends that this evidence would have weakened Gomez's credibility regarding his account of Castillo's actions on the night in question.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge must first find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The court's findings of fact are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*.

To obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for

---

[4] This July 27, 2016 document was not an "amended" information as argued by Castillo.

[5] As stated in MCR 6.113, the arraignment on the information gives a defendant a chance to enter his or her plea. It is evident from the record that Castillo was pleading not guilty. Indeed, on July 28, 2016, the case was already scheduled for trial.

counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Castillo's medical records show that he was treated for a fractured femur on March 29, 2016, and "was placed in a long leg splint." A section labeled "history of presenting illness" states, "This is a 32-year-old gentleman who was apparently fleeing from the police when he was pushed off the road by the police car causing him to be pinned between a police car and his car door. He had immediate pain to the left leg. He was brought to the emergency department and was found to have a left femur fracture." In another section, the medical records state, "The patient was fleeing from police when he was pushed off the road by the police car causing the vehicle to run into a tree. The patient states the front driver's side door opened up and he fell out of the vehicle at which point he was run over by the police vehicle, causing his legs to be pushed up towards his chest and torso." The records state that as of March 31, 2016, Castillo was out of bed; was "ambulating with minimal difficulty using a walker;" was adamant about leaving the hospital; and left the hospital a day early, against medical advice.

Piazza testified at an evidentiary hearing that he went through the medical records at the time of trial. He stated:

> The reason why we didn't go into the medical records themselves is because the medical records themselves were replete with the fact that he was fleeing from the police at the time, and I did not want that in front of the jury. I did not want any slippage of that in front of the jury.

Piazza introduced evidence of Castillo's leg injury through the testimony of multiple witnesses.

Castillo contends that Piazza's reasoning for not introducing the medical records was faulty because the fleeing and eluding occurred before the fracturing of the leg, the events were not simultaneous, and therefore the information about fleeing and eluding could have been kept from the jury. This contention makes no sense in light of the excerpts from the records as discussed above; clearly the leg fracture occurred in the course of and as a result of Castillo's fleeing and eluding. And Castillo provides no other authority or argument for how Piazza could have introduced the records without also allowing introduction of the cause of the leg injury. An appellant may not leave it up to this Court to unravel his arguments for him or search for authority to sustain his position. *People v Bowling*, 299 Mich App 552, 559-560; 830 NW2d 800 (2013). In addition, the records show that Castillo was quite determined to push through his injuries despite any medical advice to the contrary. Under the circumstances, it was reasonable trial strategy for Piazza to introduce the alleged difficulty in Castillo's ability to move through various witnesses as opposed to using the medical records. Moreover, given that the records merely reflect, in pertinent part, what the jurors learned through witnesses, there is no reasonable probability that introducing the records would have led to a different trial outcome for Castillo. *Ackley*, 497 Mich at 389.

Castillo contends that an expert could have informed the jurors about how long such a fracture takes to heal. The problem with this contention is that Castillo points to no evidence that

a medical expert would have testified in his favor, i.e., would have testified that on June 3, 2016, Castillo would still have had significant difficulty with movement. A defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). In other words, the defendant must prove his or her claim. *Id*. See also MCR 7.212(C)(7) (stating that facts pertinent to an appellant's argument must be supported by references to the lower court record). The decision regarding whether to call a witness is presumed to be trial strategy, *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004), and in light of the dearth of pertinent evidence in the record, Castillo has not overcome this presumption. Nor has Castillo demonstrated that the failure to call an expert witness deprived him of a substantial defense. *Id*. Reversal is unwarranted.

## V. NEWLY DISCOVERED EVIDENCE

At trial Felton Shelton, who lived down the street from the scene of the assault, testified on behalf of the defense. He stated that he saw and heard a commotion on Gomez's porch on the night in question, but could not see the scene well, ascertain the races of the persons involved, or describe them. Piazza testified that he introduced Shelton's testimony to weaken Gomez's credibility. Shelton spoke of seeing more people than just Gomez, Castillo, and Conley—and Gomez had testified that only Castillo and Conley had been involved in the assault against him. In addition, Gomez testified that a gun went off during the struggle that night, but Shelton denied hearing any gunshots.

Approximately two years after trial, Shelton, through an affidavit and testimony at an evidentiary hearing, claimed that he saw the people assaulting Gomez that night, and that they were not Castillo and Conley. He also claimed that Gomez had tried to bribe him to say that the assailants were Castillo and Conley.

Conley claims that Shelton's affidavit and evidentiary hearing testimony constitute newly discovered evidence warranting a new trial. This Court reviews a denial of a motion for a new trial for an abuse of discretion. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). For a new trial to be warranted on the basis of newly discovered evidence, a defendant must show that

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*Id*. at 279 (quotation marks and citations omitted.]

"It is . . . well established that motions for a new trial on the ground of newly-discovered evidence are looked upon with disfavor, and the cases where [the Michigan Supreme Court] has held that there was an abuse of discretion in denying a motion based on such grounds are few and far between." *Id*. at 279-280 (quotation marks and citation omitted). "In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *People v Johnson*, 502 Mich 541, 566-567; 918 NW2d 676 (2018). "[A] trial court's credibility determination is concerned with whether a *reasonable juror* could find the testimony credible on retrial." *Id*. at 567 (citation omitted). "If a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a

reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief[.]" *Id.* at 568. When the motion is based on recantation testimony, such testimony is generally regarded as untrustworthy. *Id.* at 578.

The trial court concluded that Shelton's "new" testimony would not be believed by any reasonable juror on retrial. The trial court stated, in part:

> Having had the opportunity to consider Shelton's recanting testimony, the [c]ourt finds it to be devoid of credibility. Shelton's recanting testimony is irreconcilable with his trial testimony, yet Shelton maintains that he testified truthfully at trial. Further, Shelton's explanations for changing his testimony are not credible. In his affidavit, Shelton accused the detectives and Piazza of threatening him with arrest if he told anyone that Castillo and Conley were not Gomez's attackers. But Shelton's [evidentiary hearing] testimony did not disclose any such threats. Shelton's claim that he did not divulge the race of Gomez's assailants at trial because Piazza told him not to is also unbelievable. Castillo, who was represented by Piazza, is hispanic. Therefore, it is inconceivable that Piazza would have instructed Shelton not to disclose that Gomez's attackers were black males with dreadlocks. Likewise, if Shelton told Piazza that Gomez tried to bribe him, the [c]ourt believes that Piazza would have explored this subject when examining Shelton at trial. Indeed, Piazza confirmed as much during his testimony at the [evidentiary] hearing.
>
> In order to find Shelton's affidavit and recanting testimony reliable on retrial, a juror would have to find that Shelton lied at the first trial when he testified that he could not determine the race of the assailants, that Gomez lied when he testified that he was assaulted by Castillo and Conley, and that [a police officer] and Piazza also lied when they testified at the evidentiary hearings before this [c]ourt. It would be unreasonable to credit Shelton's recanting testimony over his trial testimony and the sworn testimony of three other individuals especially when Shelton waited nearly two years after trial to recant and there is no other independent evidence to corroborate Shelton's latest version of events. The involvement of Castillo's mother in preparing Shelton's affidavit is also concerning and does not reflect well on the veracity of its contents.
>
> In sum, the Court finds that Shelton's recanting testimony is extremely suspect and would not be worthy of belief by a reasonable juror on retrial.

The trial court's reasoning is persuasive, and the court did not err by finding that Shelton's "new" testimony would not be believed by any reasonable juror. The trial courts finding is supported by the record. For example, cutting against Shelton's credibility is that Shelton claimed that he told Piazza about the bribes offered by Gomez, but Piazza stated that if he had been informed of such bribes, he would have explored the issue at trial. It is reasonable to conclude that a defense attorney would elicit this type of information to severely damage the credibility of a complainant. And not only is it suspect that Shelton had Castillo's mother's assistance in preparing his affidavit, but it is also suspect that Shelton first alleged that only he and *his* (Shelton's) mother

had compiled the affidavit. He admitted the help from Castillo's mother only after further questioning.

But the most pertinent facet of all in terms of the trial court's assessment of Shelton's new testimony is that he claimed at the evidentiary hearing that he told the truth at trial, even though at the evidentiary hearing and in his affidavit, he was averring something else entirely. He claimed at trial that he could not discern the races of the people at Gomez's residence on the night in question or see well enough to describe them, and that he thought "it was a party, actually, to be honest," but claimed at the evidentiary hearing that he saw black males with dreadlocks assaulting Gomez. The trial court did not abuse its discretion by concluding that no reasonable juror would find Shelton's "new" testimony to be credible and by denying, therefore, the motion for a new trial based on newly discovered evidence.[6]

Castillo's argument in connection with Shelton's "new" testimony is centered on ineffective assistance of counsel. He appears to be arguing that Piazza should have been more diligent in interviewing Shelton because if he had been, he would have learned of Shelton's exculpatory testimony. He claims that Piazza was "aware of all the exculpatory information that Mr. Shelton had provided" to the police. But Michigan State Police Detective Trooper Denny Montgomery, at the evidentiary hearing, denied that Shelton gave him the additional exculpatory information during his interview and denied Shelton's claim that the trooper told him to refrain from mentioning, at trial, the offers of bribes from Gomez. Piazza said that he had made sure to have "every [police] report that there was," and indicated that he interviewed Shelton before trial. Castillo's attorney asked Piazza at the evidentiary hearing, "Were you aware that Mr. Gomez, the victim—the so-called victim, offered Mr. Shelton money or drugs to say that he had seen Alonzo Castillo and Robert Conley assaulting him?" Piazza replied, "I was informed by somebody that the complaining witness had approached Shelton and asked him not to testify. I asked Mr. Shelton that before I put him on the stand, and he said that was not true. So I left it alone." Piazza averred that if he had learned that Shelton had been offered cocaine from Gomez to refrain from testifying, he would have explored that issue at trial.

The court rejected the contradictory "new" evidence offered by Shelton, whereby he claimed that he did provide additional exculpatory information before trial, and it was not clearly erroneous for the trial court to make the factual finding that Detective Trooper Montgomery's and Piazza's version of events was true. *LeBlanc*, 465 Mich at 579. Hence, the premise of Castillo's argument is faulty because he is putting forth a version of events that was rejected by the trial

---

[6] To the extent that Conley is raising an ineffective-assistance argument in connection with Shelton's testimony, this argument was affirmatively waived below, and we need not address it. *People v Carter*, 462 Mich 206, 216; 612 NW2d 144 (2000).

court, i.e., that Piazza knew or could have known of the exculpatory information before trial. Reversal is not warranted.

## VI. DOMESTIC VIOLENCE POLICE REPORT

Castillo argues that Piazza rendered ineffective assistance of counsel by failing, at trial, to elicit information, gleaned from a police report involving alleged domestic violence between Gomez and Flores, that Gomez was not at his home on the night of the assault.

Castillo has abandoned this issue on appeal by failing to brief it. See *Bowling*, 299 Mich App at 559-560.[7] The issue is without merit in any event. Saginaw Police Officer Richard Delong testified at an evidentiary hearing that on June 9, 2016, he responded to a report of a domestic assault and drafted a police report. He stated that the domestic violence incident being reported had occurred on May 30 or 31 of 2016, and that he had mistakenly written the dates of June 2 and 3, 2016, in his report. He also stated that the date he looked for Gomez in conjunction with his investigation of the incident, only to find him not at home, was June 9, 2016—i.e., *not* the evening of the assault on Gomez. In addition, as noted by the trial court, there was simply no dispute at trial that Gomez *was*, in fact, at his home in the early-morning hours of June 3, 2016, and sustained serious head injuries there. Indeed, the police responded to the home on that date, and he was transported from that location to the hospital, and was treated on that same date. Piazza did not render ineffective assistance of counsel by failing to delve into this issue at trial because it was without merit and would not have affected the outcome of the trial. *Ackley*, 497 Mich at 389.[8]

## VII. EXTRANEOUS INFLUENCES ON JURY

Castillo and Conley argue that a new trial is required because the jury was subject to improper extraneous influences. Family members and friends of Castillo allegedly spoke with a man, Juror Brooks, who served on the jury and who made claims of extraneous influences.

As noted, this Court reviews for an abuse of discretion a trial court's decision regarding a motion for a new trial. *People v Gadomski*, 232 Mich App 24, 27; 592 NW2d 75 (1998); see also, generally, *People v Messenger*, 221 Mich App 171, 175; 561 NW2d 463 (1997) (involving a motion for a mistrial based on alleged juror misconduct).

---

[7] Castillo sets forth this issue in his final appellate brief received on March 26, 2020. However, he does not make any argument about the issue in the body of that brief. The issue had been discussed in a prior brief, but that brief was withdrawn and never refiled.

[8] We note, too, that Piazza stated at the evidentiary hearing that he was aware of a police report regarding an incident between Gomez and Castillo's mother, but did not make an issue of it at trial because "it would have given the prosecution motive for my client to make an assault on the complaining witness, and I did not want to give the jury a motive for my client to, you know, be involved in this." This was certainly a reasonable strategic decision, given the ultimate irrelevance of the police report.

-10-

In *People v Fletcher*, 260 Mich App 531, 539; 679 NW2d 127 (2004), this Court stated, "[W]here there is evidence to suggest the verdict was affected by influences external to the trial proceedings, courts may consider juror testimony to impeach a verdict." To establish error requiring reversal based on external influences on the jury, a defendant must show that the jury was exposed to extraneous influences, and that these influences created a substantial and real possibility of affecting the verdict. *Id*. at 540; see also *People v Stokes*, 501 Mich 918; 903 NW2d 194 (2017).

There was, quite simply, no juror "testimony" here to impeach the verdict. Despite extensive efforts by the defense attorneys, Brooks would not appear to testify at the evidentiary hearings on remand. Although he provided a written statement, it was never notarized. Paula Bebout, a friend of Castillo's, testified that Brooks agreed to get the statement notarized, but then did not show up to do it. In *People v Budzyn*, 456 Mich 77, 92; 566 NW2d 229 (1997), the Court analyzed "sworn affidavits" by jurors, but no sworn affidavits are at issue here. At issue here is a statement allegedly signed by Brooks, and not sworn or notarized. And the testimony of Castillo's witnesses at the evidentiary hearing regarding what Brooks told them is hearsay and not sufficient to establish any extraneous influence on the jury. *Id*. at 92 n 14.[9]

The trial court correctly concluded that defendants produced no competent evidence to support their claims about extraneous influences on the jury. No error requiring reversal occurred.

## VIII. *BRADY* VIOLATION

Castillo and Conley argue that a *Brady*[10] violation occurred because the prosecutor failed to turn over to the defense exculpatory evidence from Shelton.

While this issue was addressed by way of a motion for a new trial, and this Court reviews for an abuse of discretion a trial court's decision regarding a motion for a new trial, *Gadomski*, 232 Mich App at 27, a *Brady* issue is a question of law reviewed de novo, *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016). Underlying factual findings by the trial court, however, are reviewed for clear error. *Id*.

A *Brady* violation occurs when "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) [that,] viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). The question of materiality involves ascertaining whether "the defendant received a trial that resulted in a verdict worthy of confidence." *Id*. at 157-159. A

---

[9] We note that in his alleged written statement, Brooks indicated that he voted to convict Castillo not on the basis of trial evidence, but mainly on the basis of social media and news reports and on the basis of Castillo's status as a violent felon as indicated by an internet website. However, Bebout's testimony—that Brooks found that the media reports and other extraneous influences were *favorable* to Castillo—contradicts the written statement itself, in which Brooks allegedly stated that he convicted Castillo *because of* the extraneous influences.

[10] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

-11-

prosecutor has a duty to learn of information known to others acting on behalf of the government, including the police. *Dimambro*, 318 Mich App at 213.

Defendants focus heavily on Detective Trooper Montgomery's testimony at trial that Shelton gave him two statements. Detective Trooper Montgomery stated at trial, "Mr. [Shelton] was consistent with his statement. And after talking with him a second time, we got a better idea of what he actually saw, what he was trying to explain." Because Shelton averred in the posttrial proceedings that he told Detective Trooper Montgomery, before trial, about his new, exculpatory information, defendants are claiming that Detective Trooper Montgomery lied at trial about the second time he spoke with Shelton and that, in fact, Shelton gave exculpatory information during this second statement and Detective Trooper Montgomery (and, by association, the prosecutor) suppressed it.

The trial court, in ruling on the motion for a new trial, stated that at the evidentiary hearing, Detective Trooper Montgomery indicated that he never learned anything new or exculpatory from Shelton after his initial interview, and never authored a second report. The court stated that it found Detective Trooper Montgomery's testimony credible and that no *Brady* violation occurred because there was nothing material for the prosecutor to disclose to the defense. The court's factual finding that Detective Trooper Montgomery had no new information to disclose was not clearly erroneous. *Dimambro*, 318 Mich App at 212. Defendants emphasize that at trial, Detective Trooper Montgomery spoke of multiple statements by Shelton, but Detective Trooper Montgomery was consistent at trial and at the evidentiary hearing that Shelton's "story" had remained the same.[11] Defendants have not established a *Brady* violation.

## IX. WEIGHT OF THE EVIDENCE

Castillo argues that the trial court should have granted his motion for a new trial because the guilty verdict went against the weight of the evidence, which instead showed that he was actually innocent. Once again, this Court reviews for an abuse of discretion a trial court's decision regarding a motion for a new trial. *Gadomski*, 232 Mich App at 27.

In *People v Lemmon*, 456 Mich 625, 634-635; 576 NW2d 129 (1998), the Court stated, "Under statute, as well as the court rule[s], the operative principles regarding new trial motions are that the court may, in the interest of justice or to prevent a miscarriage of justice, grant the defendant's motion for a new trial." (Quotation marks and citations omitted.) The Court cited MCL 770.1, which states, "The judge of a court in which the trial of an offense is held may grant a new trial to the defendant, for any cause for which by law a new trial may be granted, or when it appears to the court that justice has not been done, and on the terms or conditions as the court directs."

Gomez testified at trial that he was a "hundred percent sure" that it was Conley and Castillo who assaulted him, and that he recognized the gun that was used during the assault because it was

---

[11] And it is likely that when Detective Trooper Montgomery mentioned at trial that he spoke a second time with Shelton, he was referring to speaking with him a second time on July 15, 2017, as part of the overall interview.

-12-

owned by Castillo's mother, Flores, and Gomez had seen it before. He claimed that Castillo had taken it from Flores in the past, and she was upset about it. The gun was unusual because it was a "seven-shot."

Michigan State Police Trooper Cody Siterlet stated that on June 11, 2016, he stopped a vehicle in Saginaw, and Castillo was in the backseat. Castillo provided a driver's license from someone else and, to try to explain why he looked different from the man on the license, claimed that he was going through chemotherapy. Trooper Siterlet searched the vehicle and found a seven-shot .357 revolver. Castillo admitted that the pants in which the revolver were found belonged to him.

Detective Trooper Montgomery interviewed Castillo and Conley, and the interviews were recorded. Castillo claimed that he was in Grand Rapids at the time of the assault, but he would not tell Detective Trooper Montgomery where he was or who he saw in Grand Rapids. Castillo denied knowing "a Robert Conley," although there was evidence that the two knew each other.

Ample evidence supported a jury finding Castillo guilty. That Conley claimed to the police that he was not with Castillo on the night in question, and that persons associated with Castillo claimed he was somewhere else at the time of the assault, raised issues of credibility and do not establish that Castillo was actually innocent. Castillo also contends that cellular-telephone analysis proved that he was in Grand Rapids on the night in question. But this is simply not true. A police officer testified that one of Castillo's telephones was in the Kentwood area, near Grand Rapids, on June 2, 2016, at 6:57 p.m., and the next connection to a tower was on June 3, 2016, at 6:44 a.m., also in the Kentwood area. The assault occurred at approximately 4:00 a.m. on June 3, 2016. No other location information for Castillo's telephones was presented.

Castillo also contends that he could not have been the assailant because of his leg injury. But the leg injury occurred two months before the assault, and the persons who testified about Castillo's difficulty with moving were, again, associated with Castillo. In addition, Gomez did not give any description about how Castillo was moving when he ran from the scene; he just indicated that both men ran away.[12]

Although Castillo contends that Gomez gave an inaccurate description of Castillo's size to the police, Gomez *knew* Castillo, and he had been dating Castillo's mother; that he gave a somewhat inaccurate size description while bleeding heavily after the assault is not of much consequence. Castillo also notes that Shelton testified at trial that he did not hear any gunshots, but Shelton admitted that he went back inside his own home after seeing people at Gomez's residence. In addition, Shelton told the prosecutor on cross-examination that he heard the commotion at Gomez's house "after the [nearby] store closed," between 2:15 a.m. and 3:00 a.m. He also said that he thought the noise was from a party, and that the people were in the middle of Gomez's driveway and not on the porch itself. This testimony corresponds with Gomez's

---

[12] Castillo also emphasizes Shelton's posttrial affidavit and testimony, but the trial court found this "new" evidence not credible. Nor was it in front of the jury.

testimony about a party earlier in the night. In other words, it is likely that Shelton was observing the commotion of people leaving the party and not the commotion of the later assault.

The evidence simply did not "preponderate[] heavily against the verdict so that it would be a serious miscarriage of justice to permit the verdict to stand." *Lemmon*, 456 Mich at 647. No basis for reversal is apparent.

## X. JOINT TRIAL

Conley argues that his trial attorney rendered ineffective assistance of counsel by failing to move for severance.

MCR 6.121 states, in part:

> **(C) Right of Severance; Related Offenses.** On a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant.

> **(D) Discretionary Severance.** On the motion of any party, the court may sever the trial of defendants on the ground that severance is appropriate to promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants. Relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of defendants or the complexity or nature of the evidence, the convenience of witnesses, and the parties' readiness for trial.

In *People v Hana*, 447 Mich 325, 346-347; 524 NW2d 682 (1994), amended 447 Mich 1203 (1994), the Supreme Court stated:

> We . . . hold that, pursuant to MCL 768.5[13] . . . and MCR 6.121(D), the decision to sever or join defendants lies within the discretion of the trial court. Severance is mandated under MCR 6.121(C) only when a defendant provides the court with a supporting affidavit, or makes an offer of proof, that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice. The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision.

The *Hana* Court stated that "[i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice" to require severance. *Id*. at 349 (quotation marks and citation

---

[13] MCL 768.5 states, "When 2 or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly, in the discretion of the court."

omitted). The Court provided the following examples of what it referred to as "potentially reversible prejudice":

> Such a risk [of prejudice requiring reversal] might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [*Id*. at 346 n 7 (quotation marks and citations omitted).]

Conley argues that prejudice was apparent because of certain evidence introduced as part of Castillo's case during the joint trial. However, Conley's argument that the evidence about locating the gun would not have been admissible if he had been tried separately from Castillo is without merit. The prosecutor's theory was that Castillo and Conley, jointly and acting in concert, assaulted Gomez, and that Conley put a gun to Gomez's head. That the gun used by Conley was found in the possession of Castillo would have been highly relevant in a separate trial of Conley, seeing as the two were alleged to have been acting in concert. See MRE 401 (discussing relevance). Conley also contends that once the jurors disbelieved Castillo's alibi testimony, Conley's fate was sealed because of his association with Castillo. We conclude that the "alibi" argument provides an example of "[i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, [and which] does not suffice" to require severance. *Hana*, 447 Mich at 349. That a codefendant's questionable alibi is to be introduced into a joint trial is not the type of substantial prejudice requiring severance. And both defense attorneys were arguing misidentification; they focused on Gomez's alleged lack of credibility.[14] In addition, Conley and Castillo did not have markedly different degrees of culpability. *Id*. at 346 n 7.

Conley has not shown that a great potential for prejudice existed such that a motion for severance would have been granted even if his counsel had made the appropriate motion. Accordingly, he cannot meet the thresholds for establishing a claim of ineffective assistance of counsel. *Ackley*, 497 Mich at 389. A remand for an evidentiary hearing regarding the severance issue is not warranted as not only did Conley fail to raise the issue in the separate motion to remand that was filed, but the record as it exists is adequate to resolve the issue.

## XI. EXPERT REGARDING IDENTIFICATION

Conley contends that trial counsel was ineffective by failing to introduce expert testimony regarding the fallibility of eyewitness testimony in order to weaken Gomez's allegedly already weak identification testimony. However, he has not offered any affidavits or testimony indicating that an expert would have testified in his favor *under the particular circumstances of this case*. Gomez saw Conley twice on the night in question, with the first time being when Conley knocked on his door before the assault. In addition, Gomez had met Conley twice in the past. Gomez stated

---

[14] We note that the court instructed the jury to consider each defendant separately.

that he was a "hundred percent sure" that it was Conley and Castillo who assaulted him. He averred that because there are businesses around the house, it was "bright enough" to see on the porch. In addition, he picked Conley from a photographic lineup. A defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel, *Hoag*, 460 Mich at 6, and Conley has not presented proposed testimony showing that an expert witness would have helped his case, given the indicators of reliability derived from Gomez's testimony. And we decline to consider documents, pertaining to eyewitness testimony in general, that Conley cites on appeal but were not presented below. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000).

This Court has stated that "[t]he credibility of identification testimony is a question for the trier of fact[.]" *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). The jury properly assessed Gomez's identification testimony, and Conley has simply not adequately supported his assertion that an expert witness would have aided his defense by questioning the reliability of this testimony. Reversal is unwarranted.

## XII. ALIBI TESTIMONY

Conley argues that his attorney rendered ineffective assistance of counsel by failing to present alibi testimony for him. Conley bases his argument on a November 2017 notarized letter from his girlfriend, Jasmyne Brown, and an affidavit from himself, both of which he attaches to a brief on appeal. But these documents are not part of the lower court record. As such, there is nothing to support Conley's argument that he had an available alibi witness that his attorney improperly failed to present. Once again, a defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel. *Hoag*, 460 Mich at 6. Conley has not done so.

Conley also argues that if this Court does not reverse on the basis of this issue, a remand is nevertheless appropriate to further explore the issue. This Court has already denied Conley's motion to remand that was based on the alibi issue. *People v Conley*, unpublished order of the Court of Appeals, entered March 28, 2018 (Docket No. 339093). We find no reason to revisit this decision and now grant a remand.

We affirm in both appeals.

/s/ Christopher M. Murray
/s/ Mark J. Cavanagh
/s/ Brock A. Swartzle